IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SUSANNE RIPPLE WELKE,

                    Plaintiff,                          OPINION AND ORDER

        v.                                              14-cv-693-wmc

MADISON METROPOLITAN SCHOOL
DISTRICT,

                    Defendant.

Plaintiff Susanne Ripple Welke, a white female born in the United States, claims that defendant Madison Metropolitan School District (the "District") discriminated against her on the basis of race and national origin by favoring native Spanish speakers for positions assisting students and their parents who are principally Spanish speakers in violation of Title VI, 42 U.S.C. § 2000d *et seq.*, and Title VII, 42 U.S.C. § 2000e *et seq.*, of the Civil Rights Act of 1964. Before the court is defendant's motion for summary judgment (dkt. #8), which will be granted in its entirety because there is essentially no evidence that Ripple Welke was discriminated against and terminated either because of her race or place of birth.

UNDISPUTED FACTS[1]

### A. Ripple Welke's Hiring and Part-Time Employment at Toki Middle and Chávez Elementary Schools

Plaintiff Susanne Ripple Welke is a white female, who was born in the United States and spoke English as her first language. She began her employment with the

---

[1] Viewing the parties' submissions in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment except as noted.

District as a Spanish-speaking, Bilingual Resource Specialist ("BRS") on a part-time basis in 2007, before becoming a full-time BRS in 2008.  Her language background before employment with the District included studying at the University of Wisconsin-Madison, where she earned her bachelor's degree in Spanish, travelling and living abroad in Spanish-speaking countries, and teaching Spanish classes.

Ripple Welke applied for a BRS position with the District in 2007.  Spanish BRSs are not teachers, but rather are tasked with facilitating communication between English-speaking teachers and administrators on one hand and Spanish-speaking students and their families on the other.  Accordingly, among the central responsibilities of a BRS is translating oral and written communications in and outside the classroom to facilitate learning and successful outcomes.  Once contacted by the District, applicants for a BRS position must complete a written translation test, which is then graded and scored.  Provided they exceed a certain score *or* have other characteristics qualifying them as potential candidates for the position, applicants then proceed to an interview conducted in both English and Spanish.

Ripple Welke scored well enough on the written translation test to be referred for an interview, but the District did not select her for the position after her interview.  Amy Christianson, who was the Assistant Director of English as a Second Language ("ESL") and Bilingual Education within the District during the time period relevant to this lawsuit, marked on Ripple Welke's "Unsuccessful Candidate Form" that she was not hired because "other candidates had higher Spanish proficiency."  (Decl. of Amy

Christianson Ex. E (dkt. #16-5).)[2]  Christianson, however, noted on the form that Ripple Welke may be a good candidate for limited-term BRS positions.

Around a month after her interview with the District, a position suddenly opened up for a part-time BRS, who would split time between Toki Middle School and Chávez Elementary School.  Christianson emailed the principals of those schools to inform them that they could schedule an interview for that position with Ripple Welke or one other candidate the District had previously interviewed.  Two weeks later, the principals informed Christianson that they desired to offer Ripple Welke the position.

As a part-time BRS at the two schools during the 2007-2008 school year, Ripple Welke worked in several different classrooms for several different teachers.  Her responsibilities included assisting students with understanding classroom lessons, conversing with Spanish-speaking family members on the phone, translating comments made on report cards and interpreting for the school nurse.[3]

## B. Ripple Welke's Transfer from Toki to Midvale Elementary School

At some point during that same school year, the District notified Ripple Welke that it was going to cut her position at Toki Middle School for the following year.  When

---

[2] Although not ultimately material either way, plaintiff purports to dispute this fact on the basis that there was no "Unsuccessful Candidate Form" in her personnel file.  (Pl.'s Resp. PFOF (dkt. #22) ¶ 40.)  Nevertheless, the court will accept defendant's proposed fact as undisputed given that: (1) Christianson submitted a declaration authenticating an attached exhibit as a true and correct copy of the form; and (2) plaintiff gives no reason to doubt that Christianson made the notes on the form contemporaneously with her interview.  *See* Fed. R. Civ. P. 56(e).  On the contrary, the outcome of the interview itself is wholly consistent with the produced form, since there is *no* dispute that Ripple Welke was initially unsuccessful as a candidate for a full-time BRS position, but recommended as a good candidate for limited-term employment.

[3] The parties disagree about the extent to which the District explained her job duties before Ripple Welke began working as a part-time BRS, but she acknowledges "learn[ing] the BRS duties by doing the work, asking questions and observing[.]"  (Pl.'s Resp. PFOF (dkt. #22) ¶ 56.)

a full-time BRS position later became available at Midvale Elementary School, Ripple Welke submitted a transfer request, as did one other internal candidate.  For whatever reason, Midvale's then principal, John Burkholder, was never able to schedule an interview with the other candidate.  As the only internal applicant who was interviewed, therefore, the District was required to approve Ripple Welke's transfer request under the terms of its collective bargaining agreement.[4]

### C. Concerns about Ripple Welke's Spanish Speaking Ability

As opposed to Toki and Chávez, which only had ESL programs, Midvale had both ESL and Bilingual programs.  The parties disagree about the difference in the amount of instruction provided in English (instead of Spanish) between ESL and Bilingual programs, but agree that ESL teachers are not required to speak Spanish, while BRSs generally speak some Spanish in both ESL and Bilingual classrooms.  Moreover, in at least some Bilingual classrooms -- those with students having an English proficiency level of four or above -- teachers conduct class primarily in English.[5]  The parties also agree that Midvale's bilingual program demanded several bilingual staff members, including two other full-time BRSs (referred to here as "N.G." and "D. J.").

---

[4] Plaintiff objects to this fact by stating that the "District would not be required to transfer a probationary BRS with inadequate job performance," but does not contend that the District was actually aware of any issues with her job performance while she was a part-time BRS at Toki and Chávez.  On the contrary, Ripple Welke asserts that her job performance before transfer was adequate.  (Pl.'s Resp. PFOF (dkt. #22) ¶ 18.)  Accordingly, the court will treat this proposed fact as undisputed as well.

[5] For the sake of additional context only, plaintiff attaches a document to her declaration with a chart from the Wisconsin Department of Public Instruction reflecting six levels of English proficiency for students who are not native English-speakers, with level six indicating full English proficiency.  (Decl. of Susanne Ripple Welke Ex. N (dkt. #23-14) ECF  7.)

When Ripple Welke first arrived at Midvale toward the end of the 2007-2008 school year, she primarily translated report cards.  The following school year, however, Ripple Welke was assigned to several classrooms, all of which, she asserts, had students with an English proficiency level of four or above and received instruction primarily in English.  Because of their capacity to speak English, Ripple Welke believed that there was no need for her to use Spanish to help students learn in these classrooms, so she did not do so.[6]  In the one bilingual kindergarten classroom for "specials" (meaning subjects such as art and music) to which she was assigned in particular, Principal Burkholder told Ripple Welke to use as much English as possible to expose students to more English.  In contrast, Ripple Welke used Spanish in the hallways, cafeteria and playground, as well as when speaking to parents on the phone.

Not long after Ripple Welke first began working at Midvale, Principal Burkholder told Assistant Director Christianson that other bilingual staff members at Midvale had expressed concerns to him about Ripple Welke's reluctance to engage in conversations in

---

[6] When Ripple Welke was asked during her deposition how she acquired her belief that "there was no Spanish used" in the academic classrooms to which she was assigned, she simply responded, "I don't recall."  (Dep. of Susanne Ripple Welke (dkt. #13-4) 64:6-9.)  In her response brief, plaintiff flatly asserts that *Burkholder* told her to speak English to level four students, but fails to include this in her proposed findings of fact in accordance with the court's procedures *or* identify Burkholder in the paragraphs of her declaration cited in an attempt to support this assertion.  (*See* Pl.'s Resp. Br. (dkt. #24) 9.)  Nevertheless, Ripple Welke expressly denies independently making the decision not to use Spanish in those classrooms.  Viewing the dispute about the source of her belief in the light most favorable to Ripple Welke, therefore, the court will infer that her belief was attributable to an express or implicit direction from someone in authority within the District, or to the District's negligence in failing to provide sufficient direction.  As a result, the court will infer that Ripple Welke believed in good faith that she was expected to use English instead of Spanish as often as possible in her academic classrooms.

Spanish, although no one ever conveyed this concern to Ripple Welke.[7]  In July 2008, between the school year in which Ripple Welke first started at Midvale and the following school year, the District assigned Pam Wilson to replace Burkholder as the principal of Midvale.   Before Wilson had even assumed her duties as principal, Burkholder apparently advised her that some of Midvale's bilingual staff members were questioning whether Ripple Welke was fluent enough to be a BRS, although again Burkholder apparently chose not to tell Ripple Welke of these concerns.

Soon after the 2008-2009 school year began, bilingual staff members at Midvale informed Principal Wilson directly that Ripple Welke seemed hesitant to converse with them in Spanish or to call Spanish-speaking parents on the phone.  Wilson relayed these renewed concerns to Assistant Director Christianson, who replied that she would have Silvia Romero-Johnson, the District's Coordinator of Bilingual Education, evaluate some of Ripple Welke's written translations.

Ripple Welke denies that there was any basis for her colleagues' expressed concerns *and* denies being hesitant to call parents.  Instead, she avers that "[n]one of the

---

[7] Plaintiff also purports to dispute whether Burkholder expressed concerns to Christianson, but the only basis for her dispute is that "[n]obody ever said anything to [her] about this, even when she was being terminated."  (Pl.'s Resp. PFOF (dkt. #22) ¶ 89.)  Perhaps this is enough to call into question Burkholder's and Christianson's recollection of this conversation, at least absent contemporary, corroborating records, but the court views this dispute as immaterial for purposes of summary judgment since Burkholder did not ultimately participate in the decision to terminate Ripple Welke and the initial, third-hand concerns by Midvale's bilingual staff made in 2008 were too remote in time to her firing in mid-February 2009 and also never shown to be the product of any bigotry.  *See* Fed. R. Civ. P. 56(e); *cf. Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003) (even bigoted comments directed toward the plaintiff in the summer of 1999, before her termination in December 1999, were "too remote to provide the link [she] needs for a 'direct evidence' case").

Midvale staff began conversations with me in Spanish or continued to use Spanish when I would attempt to speak with them." (Decl. of Susanne Ripple Welke (dkt. #23) ¶ 22.)

In September 2008, Wilson was also informed that a Spanish-speaking parent wrote a letter to a teacher at Midvale to explain that she had called to report her child's absence on an earlier date. In her letter, that parent complained of being referred to someone who did not speak Spanish well. Upon receiving a copy of the letter, Wilson directed staff members to investigate who spoke to the parent on the phone. After learning that Ripple Welke was the BRS the parent referenced in the letter, Wilson again contacted Christianson.[8] They then decided to schedule a meeting with Ripple Welke to discuss her job performance.

### D. First Meeting

Ripple Welke, Wilson, Christianson, Romero-Johnson, Heidi Tepp, a labor relations attorney for the District, and Ken Volante, a union representative, attended the first meeting, which was held on October 14, 2008. Like Ripple Welke, Wilson and Christianson are both white females born in the United States, whose native language is English. (Decl. of Pamela Wilson (dkt. #12) ¶ 2; decl. of Amy Christianson (dkt. #16) ¶ 2.) Romero-Johnson was born in Argentina and learned Spanish as her native language. (Decl. of Silvia Romero-Johnson (dkt. #15) ¶ 3.) The District represents that she is Hispanic. (Def.'s Opening Br. (dkt. #9) 29.)[9]

---

[8] When a Spanish-speaking parent calls Midvale's main office, which is staffed with individuals who are not fluent in Spanish, the person who answers the call contacts a BRS to speak with the parent.

[9] The record does not indicate Tepp's or Volante's place of birth or native tongue, but the parties

During the meeting, Wilson commented that Ripple Welke appeared to be more comfortable using English than Spanish.  The District contends that Wilson made this remark in reference to the concern voiced by other Midvale staff members that Ripple Welke would respond in English even when they addressed her in Spanish, as well as Wilson's own observations of Ripple Welke in the classroom as part of her normal duties as Midvale's principal.  Ripple Welke, on the other hand, contends that Wilson would not have held that same belief if she were Latina, had a Latina name or spoke Spanish as her native language.

Also during the October 14 meeting with Ripple Welke, Romero-Johnson reviewed errors in some of her written translations.  Specifically, Romero-Johnson identified errors in grammatical structure, verb tense, and the writer's intended meaning.  Ripple Welke acknowledged making mistakes in her written translations, explaining that she did not use Spanish often during a six to nine year period before her employment with the District.[10]

---

agree that Wilson, Christianson, and particularly Romero-Johnson were the District's decision-makers with respect to evaluating and ultimately terminating Ripple Welke's employment.

[10] Although Ripple Welke acknowledges some errors in her written translations, the parties generally disagree about the quantity and quality of those inaccuracies in some of her translations, with plaintiff formally moving to strike internet translations submitted by defendant in support of its position.  (Dkt. #30.)  Defendant also notes that Equal Rights Officer Steven Herje of the Wisconsin Equal Rights Division found Ripple Welke's translations were "riddled with the most basic errors of the sort which would never be made by native speakers (educated or not)."  (Def.'s Opening Br. (dkt. #9) 33.)  On the present record, the court is not able to resolve the parties' disputes regarding the accuracy of certain translations.  Rather, for purposes of summary judgment, the court will simply credit plaintiff's general assertion as the non-moving party that Romero-Johnson incorrectly identified some errors in the written translations because of her familiarity with a different Spanish dialect.  Moreover, since both the "trigger" for Ripple Welke's review and reasons for firing were principally (if not wholly) due to her *speaking* skills, the disagreement is largely immaterial.  Accordingly, the court will deny plaintiff's motion to strike as moot.

This first meeting concluded with Ripple Welke stating that she would make efforts to improve her Spanish, and the District assigning Romero-Johnson to observe her oral and written Spanish proficiency.  The parties also planned to schedule another meeting after Romero-Johnson had the opportunity to further observe Ripple Welke on the job.  While 2008-2009 was Romero-Johnson's first school year as the District's Coordinator of Bilingual Education, plaintiff acknowledges that she had extensive experience working with BRSs and other bilingual staff members, including experience in assessing classroom performance and written translations.

### E.  Follow Up Evaluation

Romero-Johnson observed Ripple Welke for about an hour on November 18 and one and a half hours on December 16, 2008.  She also observed Ripple Welke escort a student from the bus to the cafeteria, interact with students on the playground and assist in an art class in which Ripple Welke spoke Spanish extensively.   In addition, Romero-Johnson evaluated written translations, which Ripple Welke again admits contained some errors, although also attributes some of the errors to Romero-Johnson having a different dialect and vocabulary, rather than actual errors in translating.  Finally, Romero-Johnson graded Ripple Welke's oral Spanish proficiency during a phone conversation utilizing the same form that the District uses to evaluate bilingual job applicants.  As to the latter, Ripple Welke received a score of nine out of a possible fifteen points, placing her in the District's "Intermediate" range of proficiency.

Midvale's Principal Wilson followed-up with Romero-Johnson in writing on January 7, 2009, expressing interest in her assessment of Ripple-Welke because "[w]ith

9

report cards being translated and many [Individualized Education Program] meetings coming up, I want to be sure parents are getting appropriate translations." Romero-Johnson responded in relevant part to Wilson's inquiry as follows:

> I observed Susanne on two occasions at Midvale Elementary. Susanne has a general positive demeanor when interacting with Spanish-speaking students. She addresses them in Spanish. Her speech is heavily accented, and at times, students do not understand what she says. I sensed a bit of frustration when she has to repeat herself because students do not understand her, although it didn't happen repeatedly. Susanne does try hard to communicate, but there is interference due to her non-native accent and grammatical errors.
>
> I have also analyzed her writing. I obtained samples from school staff, and Susanne herself provided additional samples. I observed that her translations are quite literal, which often do not convey the meaning intended by the original writer. Also, she is still developing the use of verb tenses which make the translations hard to understand. . . . .
>
> Susanne's translation skills are far behind from what is expected from a BRS responsible for making accessible to parents the culture of schools. I believe she would be difficult for parents to understand on the phone. Parents are usually very grateful of anyone speaking any level of Spanish who would help them. Susanne could help them on a face-to-face [basis], with some level of struggle. However, her speaking skills need to be at a higher level as a BRS. Susanne's Spanish language skills are below what is expected for a BRS, and would probably need extensive additional language training, beyond the level of continuing support that a typical BRS with high level of language skills would require.

In response to Romero-Johnson's message, Wilson indicated that she was "interested in the next steps, and moving as quickly as possible."

### F.  Second Meeting

The second meeting was held on January 20, 2009, with the same individuals in attendance.  During that meeting, Romero-Johnson presented her observations of Ripple Welke's Spanish skills.  Ripple Welke disagreed with Romero-Johnson's conclusion that her Spanish was difficult to understand and disputed several of the apparent errors identified in her written translations, explaining that some words were unfamiliar to Romero-Johnson because she learned Spanish in a different dialect.

Ripple Welke also contends that Wilson and Tepp made remarks at the meeting that suggest discriminatory animus.  According to Ripple Welke, Wilson remarked that she would not be having problems with her Spanish if she were "a native speaker."  While Wilson does not recall (and therefore does not deny) making that statement, the District denies that it evinces any bias on her part.

Finally, Ripple Welke claims that after the District agreed to give her additional time to demonstrate her capability, the District Labor Relations Attorney Tepp told her, "You can't learn a language.  You either know it or you don't."  The District responds that this, too, does not express discriminatory bias, but rather Tepp expressing her belief that Ripple Welke would be unable to make satisfactory improvements in her Spanish within the timeframe the District was willing to delay its decision on her possible termination.  Regardless, the District scheduled another meeting with Ripple Welke in approximately one month.

### G. Further Observation

On January 28, 2009, Romero-Johnson and Christianson again observed Ripple Welke.  The parties' assessments regarding Ripple Welke's job performance on that day differ sharply.  Romero-Johnson concluded that she took longer to translate a letter than the District would expect from a BRS and that she spoke hesitantly on the phone, both conclusions Ripple Welke contests.  Similarly, Romero-Johnson concluded that Ripple Welke struggled to translate a music lesson accurately, while Ripple Welke maintains that she had difficulty conveying the lesson because it was too long, too complex and also age-inappropriate for its audience, which consisted of kindergartners with low English proficiency.  In addition, Ripple Welke points out that Romero-Johnson described one of her written translations as "better" on January 28, and she again challenges some of the errors Romero-Johnson purported to identify.

After observing her performance on January 28, Romero-Johnson and Christianson told Ripple Welke that they were not persuaded she was capable of meeting their expectations as a BRS.  Christianson also wrote Ripple Welke a letter summarizing the District's evaluation of her Spanish ability based on the meetings and observations.  On February 13, 2009, Ripple Welke responded with a letter to the District defending her job performance.

### H. Final Meeting and Termination

On February 16, 2009, the same individuals attended the final meeting as were present for the first and second.  Despite demonstrating that her job performance had improved, Ripple Welke contends, Tepp, Romero-Johnson and Wilson each stated at this

meeting that she had shown "no improvement."   Ripple Welke added that Romero-Johnson and Christianson said she had "failed" the written test the District gave her as part of the BRS application process, adding that she "never should have been hired."  The bottom line is not in dispute:  Ripple Welke was informed at the meeting that Christianson, Wilson and Romero-Johnson had decided collectively to fire her.

### I.  Other Midvale BRSs

Two other BRSs, N.G. and D.J., one Nicaraguan and one Puerto Rican, worked full-time alongside Ripple Welke at Midvale.  Ripple Welke asserts that the District never observed them or evaluated their Spanish proficiency in the same manner, despite the fact that they had lower scores than she on the BRS application test.  From their lower scores, along with the District's assessment that at least one of the other two BRSs had a Spanish proficiency level appropriate for elementary grades that was similar to her own, Ripple Welke would infer that they also made similar Spanish errors.  Finally, Ripple Welke contends that Wilson's perception that she was less comfortable using Spanish in her classrooms may have been warped by the fact that the other two BRSs were placed in classrooms in which they were expected to use Spanish more often than in her classroom.

At the same time, there is no evidence that anyone within the District, including especially the decision-makers here (Wilson, Christianson and Romero-Johnson), had been made aware of any complaints about the Spanish speaking ability of any other BRS, nor about the amount of Spanish they spoke in their classrooms.  Additionally, the parties agree that the District hired a white female to replace Ripple Welke as a BRS who

was born in the United States and whose native language is English.  There is also no dispute that Christianson interviewed and recommended that the District hire several other Caucasian BRSs while she was the Assistant Director of ESL and Bilingual Education.

OPINION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  At summary judgment, plaintiff must "show through specific evidence that a triable issue of fact remains on issues for which [she] bears the burden of proof at trial. . . . [T]he evidence submitted in support of [her] position must be sufficiently strong that a jury could reasonably find for [her]."  *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009) (internal quotation omitted).  In deciding a motion for summary judgment, the court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Here, Ripple Welke, a white female born in the United States, claims reverse discrimination, asserting that the District terminated her on the basis of her race and national origin in violation of both Title VI and Title VII.  More precisely, she claims that the District fired her from the position as a Spanish-speaking BRS because she is not a native Spanish speaker.[11]

_____

[11] Certainly, reference to one's native tongue may be code for discriminating based on race or nation of origin, although in a reverse discrimination case, especially one where language facility is

In evaluating her intentional discrimination claims, the court applies the same basic framework under both Title VI and Title VII.[12]  *See Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 795 (7th Cir. 2006).  A plaintiff alleging discrimination can proceed under the direct or indirect method.[13]  *Silverman v. Bd. of Educ. of the City of Chi.*, 637 F.3d 729, 733 (7th Cir. 2011).  Under the direct method, Ripple Welke must present "either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated" the

legitimately the central qualification for employment, it might be argued that considering one's "native tongue" is not really about not being white or raised in the United States, since there is no evidence that the same concerns would not be raised by the District for a Latino, whether born in the United States or elsewhere, who spoke English as their first language or be raised for a white person born in the United States whose native language was Spanish.  Rather than find such a claim is precluded, however, the court only considers the context in which the qualities of a "native" Spanish speaker arose as part of its larger obligation to weigh the circumstantial evidence of discriminatory intent.

[12] There are, of course, substantive differences between the two types of claims.  For example, Title VII affords Ripple Welke some relief upon a showing that race was a motivating factor, whereas Title VI claims may require but-for causation.  *See* 42 U.S.C. §§ 2000e-2m, 2000e-5(g)(2)(B) (authorizing Title VII discrimination claims where an improper consideration was a "motivating factor" for the adverse action); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-78 (2009) (rejecting mixed-motive claim in ADEA context and defaulting to "general rule" requiring but-for causation); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010) ("Although the *Gross* decision construed the ADEA, the importance that the Court attached to the express incorporation of the mixed-motive framework into Title VII suggests that when another anti-discrimination statute lacks comparable language, a mixed-motive claim will not be viable under that statute.").  Defendant also argues that dismissal of plaintiff's Title VI claim is required because there is no evidence that "the District received federal funds for the primary purpose of providing employment."  (Def.'s Opening Br. (dkt. #9) 38 (citing cases in support).)  Because the court holds below that plaintiff has failed to put forth sufficient evidence of intentional discrimination under the lower standard of Title VII, however, it need not take into account these distinctions, nor the parties' arguments regarding the District's receipt and usage of federal funds.

[13] As plaintiff points out, the Seventh Circuit has recently criticized the rigidity of the direct and indirect frameworks, but it nevertheless encourages courts to continue analyzing discrimination claims at summary judgment through those traditional lenses, keeping in mind the "ultimate question . . . whether a reasonable jury could find prohibited discrimination."  *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 789-90 (7th Cir. 2015) (internal quotation marks omitted) (quoting *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014)).  Accordingly, the court continues to utilize this framework, however clunky it may be, keeping in mind the ultimate question for a jury.

District's decision to terminate her employment. *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011). Under the indirect method, in contrast, a plaintiff follows the traditional framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). For reasons explained below, plaintiff falls well short under either method.

## I. Direct Method

The most straightforward way for plaintiff to satisfy her burden of establishing a prima facie case of discrimination is to present direct evidence, "which would entail something akin to an admission by the employer[.]" *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (internal quotation marks and citation omitted). Alternatively, plaintiff may rely on circumstantial evidence, which includes: "suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better treatment." *Burnell*, 647 F.3d at 708; *see also Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009).

To survive summary judgment by relying on circumstantial evidence under the direct method, plaintiff's evidence must be sufficient to create "a convincing mosaic of discrimination." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 674 (7th Cir. 2012). "Whatever circumstantial evidence a plaintiff presents 'must point directly to a discriminatory reason for the employer's action.'" *Burnell*, 647 F.3d at 708 (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

Plaintiff relies on three different statements as evidence of the District's discriminatory animus: (1) Wilson's comment that Ripple Welke appeared to be more

comfortable using English than Spanish; (2) Wilson's remark that Ripple Welke would not be having problems with Spanish if she were a native speaker; and (3) Tepp saying, "You can't learn a language.  You either know it or you don't."  None of the three statements amount to direct evidence that the District fired her out of an intent to discriminate; indeed, plaintiff all but concedes as much by characterizing the statements as evidence supporting an *inference* that "Wilson, Tepp and Romero-Johnson were more willing to believe that Ms. Ripple Welke was incompetent, precisely because she was not a native Speaker with an Hispanic ethnic background."  (Pl.'s Resp. Br. (dkt. #24) 16.)

At most, the three statements plaintiff identifies may serve as circumstantial evidence permitting an inference of discrimination, particularly since *none* of the statements are attributable to the principal decision-maker, Romero-Johnson, Tepp was not even a decision-maker and Wilson was one of three decision-makers.  Even assuming that a reasonable finder of fact *could* infer discriminatory intent from the three statements, however, defendant offers several reasons why each statement is ambiguous. First, Wilson's statement regarding Ripple Welke's comfort with speaking English as opposed to Spanish is based on her own observations of Ripple Welke in class, informed by her observations of other BRSs, as well as concerns about Ripple Welke's willingness and ability to speak Spanish to her colleagues and at least one parent, which were relayed to Wilson.[14]   Second, even if Wilson made the "native speaker" remark, she may well

---

[14] Plaintiff suggests that because Wilson was not herself a Spanish speaker, she could not have relied on these observations, but that is not true, because a supervisor can rely on the observations of other employees and customers, and because she was in a position to evaluate Ripple Welke's performance in the classroom based on that of other BRSs and on student reactions, especially when the latter was apparently almost exclusively conducted in English,

have been commenting on the *type* of errors Ripple Welke was making, rather than suggesting that Ripple Welke needed to be a *native* Spanish speaker in order to be qualified as a BRS.[15]   *See Tippie v. Spacelabs Med., Inc.*, 180 F. App'x 51, 54 (7th Cir. 2006) ("Taken in context, [the decision-maker's] use of the phrase "not native" was a manner of describing [the plaintiff's] Spanish language abilities, not her national origin. In any event . . . it is not direct evidence of discrimination.").  Third, a more reasonable interpretation of Tepp's remark was that one versed in a language is either competent or not, and the District is unwilling to give Ripple Welke an extensive amount of time to develop Spanish proficiency "on the job."

While this court would be inclined to resolve each of these inferences in defendant's favor given that one might suppose the ideal of any language expert is presumably "to speak as a native," especially when one's job is principally to assist with the understanding of native speakers, the statements challenged here at least fall short of *admissions* that the District terminated Ripple Welke's employment "based solely on an impermissible ground."  *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004).  At minimum, the ambiguity of the statements, standing against the District's hiring of a white non-native Spanish speaker to replace Ripple Welke, her admitted hiatus from even speaking Spanish of some six to nine years before taking a position with

---

however limited by her own lack of facility with Spanish.

[15] Plaintiff also suggests that a reasonable jury could infer discriminatory animus because Wilson "lied" about making this remark, citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).  The fundamental problem with this argument (aside from the difference in the nature of the remark itself) is that Wilson did *not* deny saying it, but rather testified she could not recall saying it, while in *Reeves*, the affirmative explanation given was demonstrably false, therefore allowing "the trier of fact [to] reasonably infer . . . that the employer is dissembling to cover up a discriminatory purpose."  *Id.*

the District *and* complaints by two other BRSs and at least one parent about her speaking skills, undermines plaintiff's claim of circumstantial evidence of discriminatory intent.[16] *Cf. Darchak*, 580 F.3d at 631-32 (employer's "stupid Polack" remark, as well as three other "suggestive" statements, made shortly before adverse employment action "add[ed] up to discriminatory intent").

The other form of circumstantial evidence that plaintiff offers is the assertion that the District's "similarly situated" employees are Hispanic and native Spanish speakers, who received systematically better treatment. Although "they need not be identical in every conceivable way" to qualify her colleagues as similarly situated, plaintiff must show that they are "directly comparable to [her] in all material respects." *Coleman*, 667 F.3d at 846 (internal quotation marks and citations omitted). Determining whether employees are similarly situated requires a "flexible, common-sense examination of all relevant factors." *Id.* (internal quotations omitted). The typical factors include: (1) whether the employees had a common supervisor; (2) whether the employees were subject to the same rules of conduct; and (3) whether the employees were engaged in similarly serious

---

[16]  Courts have warned in an analogous employment discrimination context that "[a]ccent and national origin are obviously inextricably intertwined in many cases," providing "an easy refuge . . . for an employer unlawfully discriminating against someone[.]" *Fragante v. City and County of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989); *see also Hasher v. Cal. State Bd. Of Equalization*, 200 F.3d 1035, 1050 (7th Cir. 2000) ("[A]ccent is generally recognized as a manifestation of national origin[.]"). But where, as here, an employee's oral language skills are legitimate considerations of job performance, a reasonable jury could only find unlawful discrimination by inferring that the defendant's real issue was not with *how* plaintiff spoke but *where* plaintiff was from. *Cf. Beaver v. McHugh*, 840 F. Supp. 2d 161, 172-73 (D.D.C. 2012) (employer's reference to plaintiff's accent as a reason for termination could, at most, constitute circumstantial evidence). This would seem especially true where the plaintiff acknowledges (indeed stresses) that she had learned to speak with a more traditional accent and dialect (presumably Castillian), rather than one familiar to her students and parents.

conduct.[17]  *Id.* at 847.  This fact-intensive inquiry is usually a question for a jury, but summary judgment is appropriate when no reasonable jury could find that a plaintiff has met her burden.  *Id.* at 846-47.

Plaintiff claims that Latino BRSs received systematically better treatment because the District never monitored their Spanish skills as closely as it did hers, even though their paper test scores reflect similar or worse translating errors.  To be more precise, plaintiff argues that a "reasonable trier of fact could infer, based on their test scores alone, that they were at least as worthy of monitoring as was Ms. Ripple Welke, but were not monitored because the District's decision-makers assumed their competency, based on their ethnicity."  (Pl.'s Resp. Br. (dkt. #24) 15.)

There are several glaring problems with plaintiff's proposed comparators when viewed in light of the relevant facts and circumstances of this case.  As an initial matter, plaintiff cannot compare herself with all other BRSs employed by the District, since the District is not the common supervisor.[18]  Indeed, Ripple Welke insists that she was never given a performance evaluation or told her Spanish was not up to par when she held part-time BRS positions at Toki Middle and Chávez Elementary Schools.  She also insists that her roles as a BRS were different with those two schools then it was as a full-time BRS at

---

[17] While "[t]he number of relevant factors depends on the context of the case," a plaintiff must at least show these three in "the usual case."  *Coleman*, 667 F.3d at 847.  The parties do not suggest any reason to depart from the usual factors, so the court considers each here.

[18] The District submitted a spreadsheet to the Wisconsin Equal Rights Division identifying that between 2008 and 2010, it employed 42 Spanish BRSs who identified as Hispanic and 23, including plaintiff, who identified as white.  (Def.'s Reply PFOF (dkt. #28) ¶¶ 226, 228.)  According to that spreadsheet, 9 of 26 BRSs for whom native language is listed identified only English as their native language, including one Hispanic BRS born in the United States.  (Decl. of Amy Christianson, Ex. 7 (dkt. #25-20).)

Midvale Elementary School.  (Pl.'s PFOF (dkt. #21) ¶¶ 3, 9, 10.)  In fact, Ripple Welke claims no discriminatory treatment until after Midvale Principal Wilson contacted Christianson to report concerns about her job performance there.  Accordingly, the only BRSs who could qualify as directly comparable to Ripple Welke are N.G. and D.J., who worked under the same principal.

Whether Ripple Welke can survive summary judgment on her claim that she is similarly situated to N.G. and D.J. turns on the second and third factors.  Plaintiff essentially collapses the two, arguing that N.G. and D.J. were never subject to any scrutiny from the District despite also committing Spanish translation errors.  With respect to these factors, however, Ripple Welke offers *no* evidence upon which a reasonable trier of fact could find that N.G. and D.J. had similarly serious job performance issues.

At most, Ripple Welke suggests that N.G. and D.J. "were at least as worthy of monitoring as was Ms. Ripple Welke," but she offers nothing in support of this contention beside her speculation based upon:  (1) their orginal lower written test scores on the District's translation test as candidates for BRS openings; (2) personnel records indicating that one of the other BRS's Spanish proficiency was appropriate for the same grade levels as Ripple Welke; and (3) her observation that there "were errors in translation in documents created by other district employees."  (Pl.'s Resp. Br. (dkt. #24) 14.)

These facts alone are insufficient for a reasonable jury to find that N.G. and D.J. are "similar comparators" for several material reasons.  Ripple Welke exhibits a

misunderstanding of her burden under the third factor -- similarly serious conduct -- by arguing that a "reasonable trier of fact could infer that these native Spanish speakers whose performance was not assessed or monitored after hire were not perfect speakers or translators." (*Id.*)  Even crediting the implication that the District required perfection from Ripple Welke as a rhetorical device, it is not enough for her to suggest that N.G. and D.J. fell below some undefined level of job performance.  Indeed, it is undisputed that Ripple Welke was not subjected to greater scrutiny because of her performance on *written* admission tests at all, or even written translations on the job, but rather because of observations about her ability to *speak* Spanish, as reported by her fellow BRSs, principal *and* at least one disgruntled parent.

Even if plaintiff had established some measurable standard of job performance below which the District claims she fell, she has presented *no* evidence upon which a reasonable trier of fact could find that N.G. and D.J. committed similarly serious errors to hers.  Certainly, their test scores before hiring cannot serve as those errors under the third factor because even though "Romero-Johnson and Christianson justified terminating Ms. Ripple Welke's employment by saying that she had 'failed the test' . . . and 'never should have been hired,'" Ripple Welke makes no suggestion that the District treated her differently from N.G. or D.J. based on written test scores.

Moreover, had plaintiff shown that the job performance of N.G. and D.J. fell short to a similarly serious degree as did her own, she still fails to present *any* evidence that the District treated them differently despite performing similarly.  Again, nothing in the record indicates that Ripple Welke was subject to any heightened scrutiny until after

22

Wilson had become aware of concerns about Ripple Welke's ability and willingness to speak Spanish from bilingual staff members at Midvale *and* a parent who spoke to Ripple Welke on the phone.  In contrary, there is *no* evidence that Wilson, Christianson, Tepp or Romero-Johnson were ever informed about any similar concerns regarding N.G. and D.J.[19]  Accordingly, Ripple Welke can only speculate that the District treated N.G. and D.J. more favorably despite their similar job performance.  That is not enough to satisfy a *prima facie* case under the direct method.[20]  *See Good*, 673 F.3d at 675 ("[G]uesswork and speculation are not enough to avoid summary judgment[.]"); *see also Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014) ("At the summary judgment stage of a proceeding, a plaintiff must 'put up or shut up' and 'show what evidence [she] has that would convince a trier of fact to accept [her] version of events.'") (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)).

---

[19] Even if N.G. and D.J. were motivated by bias against her as a non-native speaker in reporting that she seemed reluctant to speak Spanish -- and plaintiff offers *no* evidence of that -- neither participated in the decision to terminate plaintiff, and their input would have been essentially immaterial to that decision given the decision-makers' intervening evaluations of plaintiff's speaking skills.  Indeed, the principal evaluations conducted by Romero-Johnson leading up to the decision to terminate make no reference to these early subjective comments.

[20] The court is cognizant that the Seventh Circuit has warned district courts about requiring too must similarity between comparators.  *See Coleman*, 667 F.3d at 851-52.  As the Seventh Circuit has explained, however, this warning was intended, at least in part, to insure plaintiffs benefitted from the intended "boost" of the *McDonnell Douglas* framework.  *Id.* at 852.  The Seventh Circuit has also suggested that this boost is, if not absent, at least less essential in a reverse discrimination context as here.  *See Phelan v. City of Chi.*, 347 F.3d 679, 684-85 (7th Cir. 2003).  Regardless, Ripple Welke offers no evidence that N.G. and D.J. are directly comparable to her in a manner that is material in the context of this case (*i.e.*, that the District was notified of similar job performance concerns about N.G. and D.J., yet decided not to observe or evaluate them in a similar fashion).  Indeed, the materiality of the District's awareness of concerns expressed about the Spanish proficiency of a BRS is underscored by plaintiff's insistence that the District lacked structure in providing feedback regarding her job performance and expectations.  (*See* Pl.'s PFOF (dkt. #21) ¶¶ 1-8, 39.)  This distinction between Ripple Welke and her proffered comparators with respect to the District's *awareness* of concerns about their Spanish proficiency is "so significant that [it] render[s] the comparison effectively useless."  *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406 (7th Cir. 2007).

Even crediting plaintiff's general assertion that the District was less inclined to identify errors committed by N.G. and D.J. because they were "native speakers," she has still not presented "a convincing enough mosaic of circumstantial evidence" that would entitle her to proceed past summary judgment.  Other than pointing to two dubious comparators, plaintiff points to three, ambiguous comments, none of which were attributable to two of the three decision-makers, including by far the most influential decision-maker here, Romero-Johnson.  Even as to Ripple Welke's challenge to the last of the three decision-makers, she can only point to Wilson's observation about the amount of Spanish actually used in her classroom and a reference to the benefits of being a "native speaker."  Specifically, plaintiff asserts that a "reasonable trier of fact could infer that Wilson would have been unlikely to have drawn such a conclusion if Ms. Ripple Welke had been a Hispanic native speaker."  (Pl.'s Resp. Br. (dkt. #24) 9.)  Similarly, while acknowledging that her written translations reviewed by Romero-Johnson contained errors, plaintiff asserts that Romero-Johnson did not give her the benefit of the doubt for some apparent mistakes, arguing that a "reasonable trier of fact could infer that Ms. Romero-Johnson would have at least extended a native Spanish speaker who was insisting that she could prove that her words and usages were correct and common, the opportunity to do so."  (*Id.* at 10.)

Both of these inferences, however, amount to speculation on the limited circumstantial evidence here.  Certainly, this limited evidence does not "lead[] *directly* to the conclusion that [the District] was illegally motivated, without reliance on

speculation."[21]  *Good*, 673 F.3d at 676 (emphasis in original).  Indeed, the circumstances here go back to the original flaw in plaintiff's reasoning, since the events triggering a more detailed evaluation of plaintiff's job performance were subjective observations by staff and at least one disgruntled parent about Ripple Welke's apparent discomfort and inability to speak Spanish, at least in an understandable dialect.  Once those concerns were raised, there is simply no evidence that the District did, or even would have, treated anyone differently than plaintiff, whatever their race or country of origin.

For that matter, plaintiff never really explains how her not being "Hispanic" or "Latino" contributed to her termination.[22]  For many third and fourth generation "Latinos" in this country, English may well be their first, if not only, language.  But if the claim is limited to those for whom Spanish is their native tongue, her claims of discrimination based on "race" or "national origin" become much more problematic.  Indeed, it is questionable whether this is a protected classification at all, much less one in a *reverse* discrimination case, which is no doubt why plaintiff repeatedly interchanges native tongue for "Hispanic" or "Latino" in her brief.  Just as crippling to plaintiff's construction of a mosaic of circumstantial evidence pointing directly to a discriminatory motive is the undisputed fact that the District has regularly employed white Spanish

---

[21] Plaintiff even lends support to the inference that both Wilson's observation and the evaluations performed by Romero-Johnson were at most unfortunate misunderstandings, rather than evidence of a discriminatory motive, suggesting that they "could have happened to anyone."  (Pl.'s Resp. Br. (dkt. #24) 10.)

[22] In the United States, the terms "Hispanic" and "Latino" are often used interchangeably, although strictly speaking, the term Hispanic "is a narrower term which only refers to persons of Spanish-speaking origin or ancestry," while Latino refers "more generally to anyone of Latin American origin or ancestry, including Brazilians for whom Spanish is not even a native tongue." *See* https://en.wikipedia.org/wiki/Hispanic%E2%80%93Latino_naming_dispute (last visited 2/4/2016).

BRSs and that Ripple Welke was *in fact* replaced by another white woman born in the United States and not a native Spanish speaker.  *See Good*, 673 F.3d at 678.

A showing of sufficient circumstantial evidence to avoid summary judgment "can be a high threshold, particularly in a reverse discrimination case."  *Id.* at 676-77.  Here, plaintiff has not begun to meet this threshold under the direct method.

## II.    Indirect Method

A variant of the familiar *McDonnell Douglas* burden-shifting analysis applies to reverse discrimination claims under the indirect method.  *Good*, 673 F.3d at 678.  To establish a *prima facie* case of discrimination under the indirect method, the plaintiff must prove:  "(1) background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand; (2) that she suffered an adverse employment action; and (3) that she was treated less favorably than similarly situated individuals who are not members of the protected class."  *Id.* (internal quotation marks omitted) (quoting *Phelan v. City of Chi.*, 347 F.3d 679, 684-85 (7th Cir. 2003) (altering first prong of the indirect case to account for reverse nature of race discrimination clam)).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the plaintiff's termination.  *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010).  If the employer satisfies this burden, the burden shifts back to the plaintiff to offer evidence that the employer's non-discriminatory reason is pretextual.  *Id.*

26

There is no dispute that Ripple Welke suffered an adverse employment action, but her *prima facie* case falters under the indirect method on the first and third prongs for many of the same reasons discussed above under the direct method.  Primarily, plaintiff is again unable to identify a comparator who received better treatment, much less offer credible evidence from which a jury could reasonably infer the District's inclination to discriminate against whites, whether by proof of an informal affirmative action policy working against her or a history of such discrimination against whites.  *See Good*, 673 F.3d at 679 (collecting cases in which plaintiffs made a sufficient showing of fishy background circumstances).

Moreover, Ripple Welke has failed to rebut the District's legitimate, non-discriminatory reason for firing her by showing that its explanation is pretextual.  To make a showing, Ripple Welke would have needed to present evidence from which a reasonable trier of fact would be able to conclude that the District was lying when it explained that it fired Ripple Welke because she did not meet its expectations regarding the Spanish proficiency of a BRS.  *See Coleman*, 667 F.3d at 853 (holding that plaintiff loses if defendant "honestly believed" its reason, even if that reason was "foolish, trivial, or baseless") (citation omitted); *Ghosh v. Ind. Dept. of Envtl. Mgmt.*, 192 F.3d 1087, 1091 (7th Cir. 1999) ("Pretext is established if the plaintiff can show that the defendant's proffered reasons are either lies or completely lacking in factual basis.").

Here, Ripple Welke asserts that three ambiguous statements attributed to Wilson and Tepp demonstrate the District's unlawful motive.  She further submits that pretext is illustrated by Wilson's claim not to remember telling Ripple Welke that she would not be

having problems with her Spanish if she were "a native speaker."  Regardless of whether or not Wilson remembered making that statement, however, none of those three remarks provide a factual basis from which a reasonable jury could infer the District lied about its reason for firing Ripple Welke.

On the contrary, it is undisputed on this record that the District:  (1) monitored Ripple Welke's job performance more closely after being notified of complaints about her oral Spanish skills by her bilingual colleagues and a student's parent; (2) held meetings to address its concerns about her performance; (3) had an experienced and highly qualified person conduct an evaluation of her speaking skills, which that person also found lacking, especially over the phone; (4) gave her additional (though admittedly limited) time to demonstrate improvement; and (5) ultimately fired her after determining that she did not make enough progress in her Spanish speaking ability.  While plaintiff submits evidence suggesting that the District may have been wrong about some of her shortcomings, establishing that the District was in error about its stated reason for an adverse action is not enough by itself to find it liable for discrimination.  *See Coleman*, 667 F.3d at 853.

Accordingly, the evidence Ripple Welke has presented at summary judgment cannot support a reasonable jury's finding of reverse race or national origin discrimination under Title VI or Title VII, and judgment must be entered in defendant's favor.

ORDER

IT IS ORDERED that:

1)  Defendant's motion for summary judgment (dkt. #8) is GRANTED;

28

2)  Plaintiff's motion to strike (dkt. #30) is DENIED as moot; and

3)  The clerk of court is directed to enter judgment in favor of defendant and close
    this case.

Entered this 8th day of February, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge